**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **SWEARINGEN SMILES LLC, and ELEISHA J NICKOLES DDS, on behalf of themselves and all others similarly situated,**<br><br>  **Plaintiffs,**<br><br>   vs.<br><br>**THE CINCINNATI INSURANCE COMPANY; THE CINCINNATI CASUALTY COMPANY; and THE CINCINNATI INDEMNITY COMPANY,**<br><br>  **Defendants.** | **Case No. _____** |

## CLASS ACTION COMPLAINT

Plaintiffs, SWEARINGEN SMILES LLC ("**Swearingen**") and ELEISHA J NICKOLES DDS ("**Nickoles,**" or collectively with Swearingen, the "**Plaintiffs**") bring this Class Action Complaint, individually, and on behalf of all others similarly situated (the "**Class**"), against Defendants**, THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, and THE CINCINNATI INDEMNITY COMPANY (collectively, "**Cincinnati**" or "**Defendant**"), alleging as follows:

## NATURE OF THE CASE

1. This is a civil class action for declaratory relief and breach of contract arising from Plaintiffs' contracts of insurance with the Defendant.

2. At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 public health emergency, Plaintiff Swearingen was forced to temporarily close its dental office beginning on March 16, 2020, and Plaintiff Nickoles was forced to temporarily close her dental

office beginning on March 24, 2020, causing an interruption to and loss of Plaintiffs' business income.

3.     Plaintiffs and the Class purchased and paid for an "all-risk" Commercial Property Coverage insurance policy from Defendant, which provides broad property insurance coverage for all non-excluded, lost business income, including the losses asserted here.

4.     Plaintiffs submitted timely notices of their claims to Defendant, but Defendant has refused to provide the purchased coverage to its insured, and has denied Plaintiffs' claims for benefits under the respective policies.

5.     Defendant has similarly refused to, or will refuse to, honor its obligations under the "all-risk" policy(ies) purchased by Plaintiffs and the other members of the putative Class of insureds.

## PARTIES

6.     Plaintiff, SWEARINGEN SMILES LLC, is a limited liability company organized and headquartered in the State of Ohio, and is a citizen of Ohio.  Swearingen operates a dentistry practice and maintains its principal place of business at 48959 Calcutta Smithferry Road, East Liverpool, Ohio 43920 ("**Swearingen Covered Property**").

7.     Plaintiff, ELEISHA J NICKOLES DDS, is an individual who resides in, and is a citizen of, West Virginia.  Plaintiff is a licensed West Virginia dentist who maintains an office location at 1320 National Road, Wheeling, West Virginia 26003 ("**Nickoles Covered Property**", or, collectively with the Swearingen Covered Property, the "**Covered Properties**").

8.     Defendant, THE CINCINNATI INSURANCE COMPANY ("**Cincinnati Insurance**"), is the wholly-owned subsidiary of the Cincinnati Financial Corporation, an Ohio corporation headquartered in Fairfield, Ohio.  Defendants, THE CINCINNATI CASUALTY

COMPANY ("**Cincinnati Casualty**") and THE CINCINNATI INDEMNITY COMPANY ("**Cincinnati Indemnity**") are wholly-owned subsidiaries of Cincinnati Insurance. Cincinnati Insurance, Cincinnati Casualty, and Cincinnati Indemnity are all headquartered in, and citizens of, Ohio. According to Cincinnati Financial Corporation's 10-K for fiscal year ending December 31, 2019, Defendant earned approximately $985,000,000 in "net written" commercial property insurance premiums in 2019, throughout the United States.

## JURISDICTION

9.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant (*i.e.,* so-called "minimum diversity of citizenship,") and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, there exists minimal diversity of citizenship because Plaintiff Nickoles (and some members of the Class) and Defendant are citizens of different states, and the aggregated claims of the putative Class members exceed $5,000,000, exclusive of interest and costs.

10.     The Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL BACKGROUND

### Plaintiffs Purchased an "All-Risk" Policy of Property Insurance That Broadly Provides Coverage for Loss of Business Income, Among Other Things

12.     Plaintiffs each purchased a contract of insurance from Defendant, whereby Plaintiffs agreed to make payments (in the form of premiums) to Defendant in exchange for

Defendant's promise to indemnify Plaintiffs for losses at the Covered Properties, including, but not limited to, business income losses.

13.     Plaintiff Swearingen's contract of insurance with Defendant bears Policy Number ECP0526359 (the "**Swearingen Policy**") and is effective for the period of February 20, 2020 to February 20, 2022 (the "**Swearingen Policy Term**").  The Swearingen Policy is attached hereto as **Exhibit A**.

14.     Plaintiff Nickoles' contract of insurance with Defendant bears Policy Number ECP0538748 (the "**Nickoles Policy**", or, collectively with the Swearingen Policy, the "**Policies**") and is effective for the period of June 1, 2019 to June 1, 2022 (the "**Nickoles Policy Term**", or, collectively with the Swearingen Policy Term, the "**Policy Terms**"). The Nickoles Policy is attached hereto as **Exhibit B.**

15.     Plaintiffs paid all premiums owed to Defendant under the Policies, and Defendant accepted all such premiums from Plaintiffs.

16.     The Policies are form policies issued by Defendant.

17.     The Policies are "all-risk" policies, which provides the broadest property insurance coverage available.

18.     The Policies provide coverage for "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."

19.     The Policies define "premises" as "the Locations and Buildings described in the Declarations."

20.     The Policies define "Covered Cause of Loss" as "direct 'loss' unless the 'loss' is excluded or limited in [the Policies]."

21.    The Policies define "Loss" as "accidental physical loss or accidental physical damage."

22.    The Policies do not define the phrase "accidental physical loss or accidental physical damage."

23.    However, the use of the disjunctive "or" in the phrase "accidental physical loss or accidental physical damage" means that coverage is triggered if either a physical loss of property or damage to property occurs.   The concepts are separate and distinct and cannot be conflated.

24.    Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use.

25.    The Policies provides Plaintiffs with, *inter alia*, various business income and extra expense coverages during the respective Policy Terms.

26.    Under the Policies, Defendant agrees to pay for the actual loss of "Business Income" and "Rental Value"  sustained by Plaintiff due to the necessary suspension of operations caused by direct "loss" to the "premises" which are "described in the Declarations and for which a 'Business Income' Limit of Insurance is shown in the Declarations."

27.    The Swearingen Policy describes the covered premises as "48959 Calcutta Smithferry Road, East Liverpool, Ohio 43920-9637," and coverage is listed for "Business Income w/Extra Expense" with a Limit of Insurance of "12 Months ALS [Actual Loss Sustained]."

28.    The Nickoles Policy describes the covered premises as "1320 National Road, Wheeling, West Virginia 26003-5706," and coverage is listed for "Business Income w/Extra Expense" with a Limit of Insurance of "12 Months ALS [Actual Loss Sustained]."

29.     Additional coverage is provided under the Policies for business income losses resulting from an "action of civil authority" which prohibits access to the Covered Properties, related to a "Covered Cause of Loss" at property other than the Covered Properties.

30.     Members of the Class also purchased a policy of insurance from Defendant providing for the same business income loss coverage and using the same form policy provisions.

### In Response to Covid-19, State Governments, including Ohio and West Virginia, Issued Sweeping Orders Shutting Down "Non-Essential" Businesses

31.     COVID-19 has spread, and continues to spread, rapidly across the United States and has been declared a public health emergency of international concern by the World Health Organization. *See* https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last accessed June 22, 2020).

32.     COVID-19 is highly contagious and can be spread exponentially in the community by persons who are symptomatic, asymptomatic or pre-symptomatic. In addition to transmission through airborne respiratory droplets, the COVID-19 virus can physically attach to and stay on surfaces of objects or materials for many days.

33.     According to a study published in *The New England Journal of Medicine*, COVID-19 is widely accepted as a cause of real physical loss and damage. It remains stable and transmittable in aerosols for up to three hours, and on surfaces for up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed June 22, 2020).

34.     Another study, published in the *Journal of Hospital Infection*, found: "Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30°C or more the duration of persistence is shorter." *See*

https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces

(last accessed June 22, 2020).

35.     With respect to dentistry practices, like Plaintiffs' businesses, COVID-19 poses a particular threat.   Most procedures performed by dentists have the potential for creating contaminated aerosols and splatter. Journal of Clinical & Diagnostic Research, *Aerosols How Dangerous They Are in Clinical Practice*, (April 1, 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4437160/.   The creation of aerosols in dentistry is of even greater concern with COVID-19:  "First, higher viral loads have been detected in nasal passages and the upper respiratory tract of individuals infected with [COVID-19], which mean coughs and sneezes may contain higher viral loads than its predecessor virus. Second, the potential for individuals infected with [COVID-19] to shed and transmit the virus while asymptomatic is much greater, and those in the latent stages of the disease often shed the virus at a higher rate. Third—and most significantly—this new virus strain has been shown to be much more efficient at traveling more considerable distances and becoming aerosolized." Perio-Implant Advisory, *COVID-19 and the problem with dental aerosols* (April 7, 2020), available at https://www.perioimplantadvisory.com/periodontics/oral-medicine-anesthetics-and-oral-systemic-connection/article/14173521/covid19-and-the-problem-with-dental-aerosols.

36.     Beginning in March, 2020, the Centers for Disease Control and Prevention ("**CDC**") issued a series of interim guidance in the dental setting recommending the delay of elective visits and procedures to protect patients, dentists and dental staff from community spread of COVID-19.

37.     On May 1, 2020, the Occupational Safety and Health Administration ("**OSHA**") also issued guidance for dentistry workers and employers recommending dentists keep their offices closed to all but urgent and emergency procedures during the COVID-19 outbreak.

## OHIO

38.     In response to the COVID-19 public health emergency, on March 9, 2020, the Governor of Ohio, Mike DeWine, declared a "State of Emergency" throughout the State of Ohio to control ingress and egress to and from property within the Commonwealth and the movement of persons within it.

39.     On March 16, 2020 the American Dental Association ("**ADA"**) "recognizing the unprecedented and extraordinary circumstances dentists and all health care professionals face related to growing concern over COVID-19" issued a recommendation that dentists nationwide postpone elective procedures.

40.     Also on March 16, 2020, the Ohio Dental Association ("**ODA**") announced that Governor DeWine has contacted them and has requested that elective procedures be rescheduled to help combat the spread of COVID-19.

41.     Thereafter, on March 17, 2020, the Director of the Ohio Department of Health (the "Director") ordered that all "non-essential surgeries and procedures [be] cancelled." The Director further stated that "[t]his Order shall remain in full force and effect until the State of Emergency declared by the Governor no longer exists, or the Director of the Ohio Department of Health rescinds or modifies this Order." ("**March 17 Order**").

42.     On March 18, 2020, the ODA released updated guidance, acknowledging the March 17 Order, and advising that "all dental practitioners [] defer all on-essential & elective procedures with immediate effect."

43. On March 19, 2020, the Small Business Administration issued Disaster Declaration #16355 issuing a Declaration of an Economic Injury Disaster for the entire State of Ohio.

44. On March 22, 2020, the Director issued an Order closing all non-essential businesses within the State of Ohio, including Plaintiff Swearingen's business. Specifically, the Executive Order, which became effective as of 11:59 p.m. on March 23, mandated that "[a]ll businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State . . . ." Amy Action, "Director's Stay at Home Order," (Mar. 22, 2020) https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf ("**Ohio Executive Order**").

45. The Ohio Executive Order also mandated that "all individuals currently living within the State of Ohio are ordered to stay at home or at their place of residence except as allowed in this Order."

46. As the March 17 Order was set to expire on April 6, 2020, on April 2, 2020, the Director issued an updated Order to expand its duration through May 1. The Director again mandated that all non-essential businesses or operations cease, and that residents must stay at home during this time.

47. On April 27, 2020, during his daily press briefing, Governor DeWine announced that dental offices may begin reopening on May 1, 2020.

48. Upon reopening, dental offices in Ohio must follow strict guidelines regarding screening patients and mandating the use of severally limited Personal Protective Equipment ("PPE"). Acknowledging that some offices may not open immediately due to the limited PPE, ODA President Sharon K. Parsons stated that:

- 9 -

> I know there is still a large concern about procuring PPE to be able to reopen your office. It is important that our patients, our staff and ourselves are protected as we begin to reopen. The ODA is working with suppliers to do our best to make the necessary PPE available to our members.

Sharon Parsons, DDS, "Dental offices can reopen May 1," (April 27, 2020) https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

## **WEST VIRGINIA**

49.     In response to the COVID-19 public health emergency, on March 16, 2020, the Governor of West Virginia, Jim Justice, declared a "State of Emergency" throughout the State of West Virginia to control ingress and egress to and from property within the state and the movement of persons within it.

50.     On March 19, 2020, the Small Business Administration issued Disaster Declaration #16354 issuing a Declaration of an Economic Injury Disaster for the entire State of West Virginia.

51.     On March 23, 2020, Governor Justice issued Executive Order No. 9-20, which mandated that residents of the State of West Virginia stay home unless the leaving the house for an essential activity. One of the essential activities that would allow residents to leave their home is to obtain "non-elective medical care and treatment," thereby indirectly prohibiting elective medical care. Executive Order No. 9-20 further mandated that all non-essential businesses temporarily cease operations throughout the State.

52.     On March 26, 2020, the West Virginia Department of Health and Human Resources ("**WV DOH**") released guidance that reiterated the Governor's Executive Order No. 9-20 by stating "[a]ll non-emergent, non-urgent in-person medical, surgical, dental, and any other health care practice or procedure must have immediately ceased effective at 8 p.m. March 24, 2020."

53.     On March 31, 2020, Governor Justice issued Executive Order No. 16-20, which mandated that "all elective medical procedures are hereby prohibited . . . this prohibition applies equally to all types of elective medical procedures performed in hospitals, offices, and clinics throughout the state."

54.     On April 3, 2020, the West Virginia Dental Association ("**WVDA**") released guidance that summarized the Governor's prior Orders and stressed the importance of following the same. The WVDA further restated that all elective medical procedures are prohibited until further notice.

55.     On April 26, 2020, President of the West Virginia Dental Board ("**WV Board**"), Dr. Vince Veltri, on behalf of the West Virginia Dental COVID-19 Task Force, submitted reopening guidelines to Governor Justice and requested that dental offices begin reopening on May 11, 2020.

56.     On April 29, 2020, Governor Justice announced that outpatient health care operations, including dental offices, may resume. The WV Board, however, required that dental offices wait until May 11, and required them to follow guidelines such as pre-screening patients and mandating the use of PPE.

57.     Acknowledging that some offices may not open immediately due to the limited PPE, Dr. Veltri stated that "[t]here are several offices around the state who are prepared (with PPE), but there are a good amount, if not more than that, who are scrambling a bit." Shauna Johnson, "Training, PPE buys underway ahead of dental reopenings in West Virginia," (May 1, 2020) https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

## OTHER STATES

58.     Most other states, including those in which the putative Class members reside and/or do business, have issued similar compulsory shut-down orders for "non-essential" businesses, or businesses deemed not to be "life sustaining." Most other states, including those in which the putative Class members reside and/or do business, have also issued directives from public health officials curtailing non-urgent or non-emergent health care services.

59.     The closure of all "non-life-sustaining businesses" evidences an awareness on the part of both state and local governments that COVID-19 causes loss of or damage to property.  This is particularly true in places where in-person business is conducted, as the contact and interaction necessarily incident to such businesses causes a heightened risk of the property becoming contaminated.

60.     For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage." *See*  https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf  (last accessed June 23, 2020).

61.     Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances." *See* https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (last accessed June 23, 2020).

62.     In upholding the Governor of Pennsylvania's Proclamation of a state-wide disaster and the Executive Orders mandating the closure of businesses within Pennsylvania, the

Pennsylvania Supreme Court noted the significant risk of the spread of the COVID-19 virus, even in locations where the disease has not been detected:

> Covid-19 does not spread because the virus is "at" a particular location. Instead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/ symptoms.html (last accessed 6/23/2020)). The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

*Friends of DeVito v. Wolf*, ___ A. 3d ___, 2020 WL 1847100, *15-16 (Pa. April 13, 2020).

63. Because the COVID-19 virus can survive on surfaces for up to fourteen days, the Pennsylvania Supreme Court ultimately concluded that "any location . . . where two or more people can congregate is within the disaster area." *Id.*

### Plaintiffs Submit a Claim Under Their "All-Risk" Policy, and Defendant Wrongly Fails and Refuses To Honor Its Obligations Respecting Same

64. As a result of the orders, guidance and protocols issued by the Governor of Ohio, the Director of the Ohio Department of Health, the ODA, the CDC and OSHA relating to the Plaintiffs' practice of dentistry (collectively the "**Ohio Mandated Shutdown Rules**"), the Swearingen Covered Property effectively closed on March 17, 2020 for provision of elective dental procedures with limited re-opening as of May 1, 2020 to provide clinically necessary treatment in cases of non-urgent and non-emergent care.

65. As a result of the orders, guidance and protocols issued by the Governor of West Virginia, the WV Board, WV DOH, WVDA, the CDC and OSHA relating to the Plaintiffs' practice of dentistry (collectively the "**WV Mandated Shutdown Rules,**" or, collectively with the Ohio Mandated Shutdown Rules, the "**Mandated Shutdown Rules**"), the Nickoles Covered Property effectively closed on March 24, 2020 for provision of elective dental procedures with limited re-opening as of May 11, 2020 to provide clinically necessary treatment in cases of non-urgent and non-emergent care.

66. Plaintiffs have incurred, and will continue to incur, among other things, a substantial loss of business income, including additional expenses covered under the Policies due to the constraints to provide elective dental care to patients at the Covered Properties because of the Mandated Shutdown Rules.

67. On March 23, 2020, Plaintiff Swearingen provided notice to Defendant of her claim for the interruption to her business.

68. After an investigation by Defendant, Defendant ultimately responded to Plaintiff Swearingen with a letter, dated May 20, 2020 (attached hereto as **Exhibit C**), indicating:

> As submitted, the claim involves the Novel Coronavirus known as SARS-CoV-2, which causes the viral infection known as COVID-19 ("Coronavirus"). The claim asserts a business income loss due to the shutdown of your practice as a result of the State of Ohio mandate to stop the spread of the Coronavirus. [Defendant] has determined that coverage is unavailable for the claimed loss.
>
> ***
>
> The [Defendant's] policy provides coverage for direct physical loss or damage to Covered Property at the premises. This direct physical loss or direct physical damage must be to property at the covered premises. [Defendant's] investigation has found no evidence of direct physical loss or damage to your premises. Similarly, there is no evidence of damage to property at other locations, precluding coverage for orders of civil authority.

Defendant incorrectly interprets "direct physical loss or damage to [the] premises" to exclude a virus that does not cause a visible physical effect on the premises.

69.     On June 6, 2020, Plaintiff Nickoles provided timely notice to Defendant of her claim for the interruption to her business.

70.     In a letter dated June 8, 2020 (attached hereto as **Exhibit D**), the Defendant responded to Plaintiff Nickoles claim by stating:

> The "Business Income" and Extra Expense coverages provided under both of these forms require that there be direct physical loss or direct physical damage caused by a Covered Cause of Loss. This direct physical loss or direct physical damage must be to property at the covered premises. Without it, there can be no business income or extra expense coverage. Moreover, as stated, direct physical loss or damage generally means a physical effect on covered property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claim involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss to property at the premises.

Based upon its improper interpretation that "direct physical loss or damage" is limited to a "physical effect" on property, Defendant concludes its letter with a request for, *inter alia*, "inspection reports and test reports referring to or relating to actual or suspected presence of Coronavirus . . . ."

### Contrary To Defendant's Position, Plaintiffs' Losses Arise From Direct Physical Loss Or Damage

71.     Plaintiffs' Covered Properties suffered "direct physical loss or damage" due to the applicable state's Mandated Shutdown Rules requiring Plaintiffs discontinue their primary use of the Covered Properties.  The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policies.

72.     Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policies, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to Plaintiffs' Covered Properties.

73.     Further, and as an additional basis for coverage under the Policies, the ubiquitous nature of the COVID-19 virus caused direct physical loss or damage to property other than Plaintiffs' Covered Properties, and such loss or damage resulted in an "action by civil authority" prohibiting access to Plaintiffs' Covered Properties, within the meaning of the Policies.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs brings this action individually and as a class action on behalf of the Class, defined as follows:

> All policyholders in the United States who purchased commercial property coverage, including business or interruption income (and extra expense) coverage from Defendant and who have been denied coverage under their policy for lost business income after being ordered by a governmental entity, in response to the COVID-19 pandemic, to shut down or otherwise curtail or limit in any way their business operations.

75.     Excluded from the Class are Defendant and its officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their staff.

76.     The members of the Class are so numerous and geographically dispersed that joinder would be impracticable. Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

77.     There is a well-defined community of interest in the common questions of law and fact affecting the Class members. These common legal and factual questions include, but are not limited to:

        a.     whether Defendant owed coverage to Plaintiffs and the Class;

        b.     whether any exclusions to coverage apply;

        c.     whether Plaintiffs and members of the Class are entitled to damages and, if so, the measure of such damages; and

        d.     whether Plaintiffs and members of the Class are entitled to equitable, declaratory and/or other relief, and if so, the nature of such relief.

78.     Plaintiffs' claims are typical of the claims of the absent class members and have a common origin and basis. Plaintiffs and absent Class members are all injured by Defendant's refusal to afford the purchased coverage. Plaintiffs' claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the refusal to provide insurance coverage for the loss. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

79.     Plaintiffs will fully and adequately assert and protect the interests of the absent Class members and has retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiffs nor Plaintiffs' attorneys have any interest contrary to or conflicting with the interests of absent Class members.

80.     The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiffs know of no difficulties in managing this action that would preclude its maintenance as a class action.

82.     Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making declaratory relief appropriate to the Class as a whole.

## <u>COUNT I</u><br>DECLARATORY RELIEF

83.     Plaintiffs incorporate by reference each and every allegation set forth above.

84.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the

rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

85.     An actual controversy has arisen between Plaintiffs and the Defendant as to the rights, duties, responsibilities and obligations of the parties in that Plaintiffs contend and Defendant disputes and denies that the Policies provide coverage to Plaintiffs for any current and future lost business income, subject to the limit of liability, for the temporary suspension of Plaintiffs' operations.

86.     The Policies provide coverage for "direct 'loss' to Covered Property," with "loss" defined as "accidental physical loss or accidental physical damage."

87.     Plaintiffs' loss of use, loss of access, and loss of functionality of the Covered Properties when the Mandated Shutdown Rules made it unlawful for Plaintiffs to fully access, use, and operate their business at each respective Covered Properties, constitutes a "loss" to the Covered Properties under the Policies.  Alternatively, the ubiquitous nature of the COVID-19 virus caused a "loss" to the Covered Properties by preventing Plaintiffs from using the Covered Properties for its intended purpose.

88.     Additionally, the Mandated Shutdown Rules or, alternatively, the ubiquitous nature of the COVID-19 virus, caused a "loss" to property other than the Covered Properties, thereby invoking coverage under the Policies' "Civil Authority" provision for "actual loss of 'Business Income' . . . caused by action of civil authority that prohibits access to the 'premises.'"

89.     The Policies constitute a valid and binding agreement obligating the Defendant to indemnify Plaintiffs for covered losses.  Plaintiffs have substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the

Policies and applicable law, or alternatively, Plaintiffs have been excused from performance by Defendant's acts, representations, conduct, or omissions.

90.    Defendant has failed to indemnify Plaintiffs for their covered losses.

91.    No exclusion to coverage applies.

92.    Plaintiffs have suffered and continues to suffer a covered loss under the Policies.

93.    Plaintiffs, individually and on behalf of the Class, seek a Declaratory Judgment that there is coverage for its business interruption losses under the Policies.

**COUNT II**
**BREACH OF CONTRACT**

94.    Plaintiffs incorporate by reference each and every allegation set forth above.

95.    Plaintiffs and Defendant entered into a contract of insurance; here, the Policies.

96.    As an insurer, Defendant has a duty of good faith and fair dealing towards its insureds, including the obligation to pay for the financial losses suffered by the Plaintiffs and members of the Class because of the Mandated Shutdown Rules.

97.    Plaintiffs and members of the Class had a reasonable expectation that the financial losses suffered because of the Mandated Shutdown Rules would be covered under the Policies.

98.    The Class members entered into a substantially identical policy with Defendant.

99.    Under the Policies, Defendant agreed to indemnify Plaintiffs and the Class for their business losses as a result of a covered loss.

100.    Plaintiffs and the Class members suffered a covered loss under the Policies.

101.    Plaintiffs and the Class members timely submitted a notice of claim and satisfied all conditions precedent to receiving the coverage it purchased from Defendant.

102.    Defendant breached its contract with Plaintiffs and the Class members by failing and refusing to provide the contracted for coverage.

103.    Defendant's breach of the contract has caused Plaintiffs and the Class to suffer damages in the amount of their unreimbursed business losses or their limits of liability, whichever is lower.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs herein pray as follows:

1)    For a declaration that there is coverage under the Policies for the interruption to Plaintiffs' business and the associated business income lost therefrom;

2)    For damages, costs and attorney's fees; and

3)    For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED**

Date:   July 2, 2020

*/s/ Gary F. Lynch*
Gary F. Lynch
Kelly K. Iverson (*To be Admitted Pro Hac Vice*)
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
P: (412) 322-9243
F: (412) 231-0246
glynch@carlsonlynch.com
kiverson@carlsonlynch.com

Howard M. Louik (*To be Admitted Pro Hac Vice*)
**LOUIK LAW OFFICES**
750 Washington Road, Unit 705
Pittsburgh, PA  15228
P: (412) 889-7541
F: (412) 391-7310
howard@louiklaw.net

*Counsel for Plaintiffs*